# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1671

_____

Keo Chanmouny,                              *
                                            *
            Petitioner,                     *
                                            *   Petition for Review of an
      v.                                    *   Order of the Board of
                                            *   Immigration Appeals.
John Ashcroft, Attorney General             *
of the United States,                       *
                                            *
            Respondent.                     *

_____

Submitted:   March 12, 2004
    Filed:   July 16, 2004

_____

Before MURPHY, SMITH, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Keo Chanmouny, a native and citizen of Laos, petitions for review of the denial of his request for suspension of deportation. After finding that Chanmouny was removable as a non-immigrant who failed to maintain the conditions of his visas, an immigration judge ("IJ") further denied Chanmouny's request for suspension of deportation and voluntary departure because he had committed a crime involving moral turpitude. The Board of Immigration Appeals ("BIA") affirmed without opinion. After reviewing the decision of the IJ, *see Palomino v. Ashcroft*, 354 F.3d 942, 943-44 (8th Cir. 2004), we deny Chanmouny's petition for review.

The Immigration and Naturalization Service instituted proceedings against Chanmouny on March 21, 1997. To avoid deportation, Chanmouny applied for suspension of deportation under the law in effect at the time of his application.[1] An alien who is deportable may be granted suspension of deportation if the alien (1) has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, (2) proves that during such period he was and is a person of good moral character, and (3) is a person whose deportation would result in extreme hardship to the alien or to his spouse, parent, or child who is a citizen of the United States or a lawful permanent resident. 8 U.S.C. § 1254(a)(1) (1994).

A person is not of "good moral character" if he or she is a member of the class of persons described in 8 U.S.C. § 1182(a)(2)(A). 8 U.S.C. § 1101(f)(3) (1994). That class includes "any alien convicted of . . . *a crime involving moral turpitude* (other than a purely political offense) or an attempt or conspiracy to commit such a crime[.]" 8 U.S.C. § 1182(a)(2)(A)(i) (1994) (emphasis added). The IJ found that although Chanmouny established continuous physical presence and an extreme hardship to his child of United States citizenship if Chanmouny were deported, he was ineligible for suspension of deportation because he lacked good moral character. This finding was based on a 1996 conviction for terroristic threats under Minn. Stat. § 609.713, subd.

---

[1]"Suspension of deportation" was a form of relief from deportation prior to the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009, 3009-546 (1996). Section 308(b)(7) of IIRIRA eliminated "suspension of deportation," and Section 304 created a new form of relief known as "cancellation of removal." Because Chanmouny's proceedings were initiated prior to the effective date of IIRIRA, suspension of deportation was the type of relief potentially available to him at that time, and we have jurisdiction under the IIRIRA transitional rules to review the denial of relief. IIRIRA § 309(c)(4); *see also Ikenokwalu-White v. INS*, 316 F.3d 798, 801, 803 (8th Cir. 2003).

1, which the IJ deemed a crime involving moral turpitude. In his petition for review, Chanmouny contends that he was not convicted of a qualifying crime.

Congress has not defined the phrase "crime involving moral turpitude," and the meaning of that phrase was left "to future administrative and judicial interpretation." *Franklin v. INS,* 72 F.3d 571, 572 (8th Cir. 1995) (quoting *Cabral v. INS*, 15 F.3d 193, 195 (1st Cir. 1994)). In reviewing an administrative decision, therefore, we give deference to the agency's interpretation of the ambiguous statutory phrase, and we uphold its construction as long as it is reasonable. *Id.*; *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999).

Over the years, the BIA has developed an analytical framework to determine whether an alien's conviction under a particular statute is a crime involving moral turpitude. First, the BIA has developed a general definition of the statutory phrase:

> We have observed that the definition of a crime involving moral turpitude is nebulous. Moral turpitude refers generally to conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general. Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude. Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.

*In re Ajami*, 22 I. & N. Dec. 949, 950 (BIA 1999) (internal citations omitted).

Second, the BIA has explained its methodology for examining a criminal conviction to determine whether the crime involved moral turpitude:

-3-

In deciding whether a crime involves moral turpitude, we must first examine the statute itself to determine whether the inherent nature of the crime involves moral turpitude. If the statute defines a crime in which moral turpitude necessarily inheres, then the conviction is for a crime involving moral turpitude for immigration purposes, and our analysis ends. However, if the statute contains some offenses which involve moral turpitude and others which do not, it is to be treated as a "divisible" statute, and we look to the record of conviction, meaning the indictment, plea, verdict, and sentence, to determine the offense of which the respondent was convicted.

*Id.* (internal citations omitted); *see also In re Franklin*, 20 I. & N. Dec. 867, 868-69 (BIA 1994), *aff'd*, 72 F.3d 571 (8th Cir. 1995).

The Minnesota statute under which Chanmouny was convicted provides, in part, that "[w]hoever threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror . . . may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both." Minn. Stat. § 609.713, subd. 1.[2] As such, the statute provides for conviction based on at least two different mental states -- "purpose to terrorize" and "reckless disregard of the risk of causing such terror." *Id.*

In considering Chanmouny's case, the IJ analyzed the statute as follows:

Looking at the statute at issue here it is clear that a threat to commit a crime of violence is the starting point. The purpose of the threat is to terrorize another person. The Court believes strongly that this is the type of base and depraved behavior that invokes the issues of moral

---

[2]A "crime of violence" includes, among others, the offenses of murder, manslaughter, and first, second, and third degree assault. *See* Minn. Stat. § 609.1095, subd. 1(d).

turpitude. The statute on its face deals with an individual threatening violence against another person to terrorize them. The Court does not believe that this is really a divisible statute, considering that [Chanmouny] was convicted under that specific statutory language. See, the complaint in the criminal case at page 14 of Exhibit 11.

(Admin. R. at 50).

Even where an administrative decision embodies "less than ideal clarity," we may uphold the decision "if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). At first glance, it is not entirely clear from the IJ's analysis whether the IJ reached his conclusion on the ground that the "statute defines a crime in which moral turpitude necessarily inheres," *Ajami*, 22 I. & N. Dec. at 950, or, alternatively, that the statute contains some offenses that involve moral turpitude and others that do not, but that Chanmouny's violation did involve a crime of moral turpitude. On the one hand, the IJ said he did "not believe that this is really a divisible statute," suggesting perhaps that moral turpitude is inherent in all violations. At the same time, however, the IJ observed that the statute requires that "the purpose of the threat is to terrorize another person," and that Chanmouny was "convicted under that specific statutory language." The latter statements, together with citation of the record of conviction in Chanmouny's criminal case, lead us to conclude that the IJ treated the overall statute as potentially divisible, but concluded from the record of conviction that Chanmouny was convicted of acting with a "purpose to terrorize," rather than "reckless disregard of the risk of causing such terror." Having discerned the IJ's path, we must evaluate whether the agency's decision should be upheld.

Chanmouny argues that the Minnesota statute is divisible, that he was convicted based on the mental state of "recklessness," and that violations committed with that mental state do not constitute crimes of moral turpitude. We need not enter the thicket of determining whether the recklessness prong of the Minnesota statute

-5-

implicates a crime of moral turpitude, *cf. Franklin,* 72 F.3d at 572-73; *In re Fualaau*, 21 I. & N. Dec. 475, 478 (BIA 1996), because we conclude that even assuming the statute is divisible, the record of Chanmouny's conviction shows that he was convicted of acting with "the purpose to terrorize," and that his violation was a crime of moral turpitude.

Where a criminal statute is divisible for purposes of the moral turpitude statute, the BIA looks to the record of conviction to determine whether the petitioner was convicted under the part of the statute that implicates moral turpitude. *Ajami*, 22 I. & N. Dec. at 950. The record of conviction typically includes the indictment or information, plea, verdict or judgment, and sentence. *Id.* We have held that an IJ is authorized to consider such records of conviction in determining deportability under a different section of the immigration statute, 8 U.S.C. § 1251(a)(2)(C), for a conviction involving the use of a firearm. *Vue v. INS*, 92 F.3d 696, 700 (8th Cir. 1996). Similarly, we agree with other circuits that the record of conviction may be reviewed to determine whether an alien was convicted of a crime of moral turpitude under a divisible statute. *See Wadman v. INS*, 329 F.2d 812, 814 (9th Cir. 1964) (quoted in *Vue*, 92 F.3d at 700); *Smalley v. Ashcroft*, 354 F.3d 332, 336 (5th Cir. 2003).

The IJ in this case received the record of Chanmouny's criminal conviction into the administrative record at the removal proceeding, and specifically cited the criminal complaint in the decision on suspension of deportation. The *mens rea* element in Chanmouny's criminal complaint was alleged in the alternative: "Chanmouny did threaten to commit a crime of violence with the purpose of terrorizing another, and/or in reckless disregard of the risk of causing terror in another[.]" (Admin. R. at 281). The complete record of conviction, however, demonstrates that the IJ was correct to conclude that Chanmouny was convicted of making threats with the purpose of terrorizing another. The factual allegations of the criminal complaint allege such a purpose by recounting that Chanmouny "admits holding a meat cleaver up by his shoulder to scare" the victim. (Admin. R. at 281).

And the transcript of Chanmouny's colloquy with the court at his guilty plea establishes that he admitted the element of making threats with the purpose of terrorizing another:

Q:      And at that time you got into an argument with [complainant]?

A:      Yes.

Q:      And you got from the kitchen a meat cleaver?

A:      Yes.

Q:      And while you were yelling at her, you had the meat cleaver in your hand?

A:      Yes, Your Honor.

*Q:      And it was your intention to scare her with that meat cleaver?*

*A:      Yes.*

Q:      But you didn't intend to actually hurt her?

A:      No.

Q:      And you agree that would be a threat, the way you were working things?

A:      Yes.

. . .

*Q:      You agree that you did this to terrorize her?*

*A:      Yes.*

(Admin. R. at 239-40) (emphases added).

Chanmouny does not dispute that the transcript of the guilty plea hearing may be considered as part of the record of conviction, *see*, *e.g.*, *Tokatly v. Ashcroft*, 371 F.3d 613, 620 (9th Cir. 2004), but contends that his responses were "ambiguous and conflicting." We disagree. His admissions that "it was [his] intention to scare her" with the meat cleaver, and "[he] did this to terrorize her" make clear that Chanmouny was convicted for making threats "with purpose to terrorize," rather than acting merely with reckless disregard for the consequences of his actions.

Having established that Chanmouny was convicted of threatening to commit a crime of violence with the purpose to terrorize another, we uphold the IJ's conclusion that the offense "is the type of base and depraved behavior that invokes the issues of moral turpitude." (Admin. R. at 50). We are guided in our analysis by the Minnesota Supreme Court's interpretation of the phrase "purpose to terrorize" in the terroristic threat statute. In *State v. Schweppe*, 237 N.W.2d 609 (Minn. 1975), the court explained that "[p]urpose in this context means aim, objective or intention" and "[t]errorize means to cause extreme fear by use of violence or threats." *Id.* at 614.

We previously have approved the BIA's longstanding general definition of "crime of moral turpitude," *Franklin*, 72 F.3d at 573, which includes acts accompanied by "a vicious motive or a corrupt mind." *Ajami*, 22 I. & N. Dec. at 950. The BIA, in a case involving the offense of aggravated stalking, has held that "the intentional transmission of threats is evidence of a vicious motive or a corrupt mind." *Id.* at 952. We agree with that conclusion, and although aggravated stalking required the defendant to engage in a "course of conduct, as opposed to a single act," *id.*, we do not see a material distinction between the two for purposes of determining whether a defendant acted with vicious motive. We believe that the crime at issue in this case -- threatening a crime of violence against another person with the purpose of causing extreme fear -- likewise falls within the category of offenses requiring a vicious motive or evil intent. This requisite intent to terrorize also serves to distinguish Chanmouny's offense from simple assault, which the BIA and various courts have declined to classify as a crime of moral turpitude. Simple assault typically is a

-8-

general intent crime, and it is thus different in character from those offenses that involve "a vicious motive, corrupt mind, or evil intent." *See Matter of O-----*, 3 I. & N. Dec. 193, 194-95 (BIA 1948).

Chanmouny contends that not every offense involving an evil intent or vicious motive is a crime of moral turpitude. *See Rodriguez-Herrera v. INS*, 52 F.3d 238, 241 (9th Cir. 1995). The Ninth Circuit thought that the crime of "malicious mischief" under Washington law -- which could lead to conviction for destroying as little as $250 of another's property with an "evil wish to annoy" -- involved an evil intent that was too attenuated from the character of the offense to establish a crime of moral turpitude. *Id*. Assuming that to be correct, we agree with the IJ that a violation of the Minnesota terroristic threat statute committed with the purpose to terrorize involves a more serious offense, and includes the requisite depravity and breach of duties owed between persons to satisfy the moral turpitude standard.

For the foregoing reasons, we deny the petition for review.

_____